[No. 1495.]

THE STATE OF NEVADA, Respondent, *v.* THE VIRGINIA AND TRUCKEE RAILROAD COMPANY, a Corporation, et al., Appellants.

Taxation—Railroads—Fiscal Year. The fiscal year for the purpose of taxation of railroads, the same as for all other property, commences on January 1st.

Idem—Net Earnings—Rule as to Rate of Interest. The rule being that the value of *this* railroad, for the purpose of taxation, should be determined, mainly, by its net earnings capitalized at the current rate of interest, a jury is justified in finding that the rate to be used in the computation is the rate of interest which investments command, and not that on temporary loans.

Idem—Economical Management—Instruction. The court instructed the jury as follows: "You are instructed that the net income of a railroad company, when necessary to be determined for purposes of taxation, is the difference between the gross receipts and necessary expenses under reasonably economical and prudent management. By 'reasonably economical and prudent management' is meant a management conducted with that care, diligence and attention which an ordinarily prudent and careful person, qualified to perform such, would take and exercise if the property so managed was his own. In any particular case, the gross receipts to be considered for said purpose are not necessarily the receipts which were in fact received, but such receipts as would be received under a reasonably economical and prudent management; and the expenses to be deducted, in order to determine the net income, are not necessarily the expenses which were in fact incurred, but such expenses as would be incurred under a reasonably economical and prudent management." *Held*, that the instruction is entirely unobjectionable.

IDEM—ECONOMICAL MANAGEMENT—EXPENSES. A reduction in the payroll of the railroad company amounting to $13,839 per annum was effected in May, 1896. It was shown that no more officers or employees were necessary in 1895 than in 1896. *Held,* that it was permissible for a jury, in determining the reasonable operating expenses for 1895, to find that the actual expenses could reasonably have been reduced by that amount and the net earnings correspondingly increased.

IDEM—VALUE FOUND BY JURY LESS THAN ASSESSMENT—PENALTIES. The penalties imposed by Stats. 1891, p. 150, sec. 48, providing that "in all suits brought for the collection of delinquent taxes ✳ ✳ ✳ the judgment shall be entered for twenty-five per centum in addition to the tax of ten per centum thereon and costs," are enforceable, although the assessment was excessive, as shown by the verdict of the jury, and although the defense interposed was that the assessment was out of proportion to and above the actual cash value of the property assessed; sec. 52 of the revenue act as amended, Stats. 1895, p. 39, providing that "the defense shall only be effectual as to the proportion of the tax based upon such excess of valuation, but in no case shall an entire assessment be declared void."

## ON REHEARING.

IDEM—EXPERT TESTIMONY. The testimony relative to the reduction in the pay of the employees and officers of the company was given by the secretary and bookkeeper of the company. Appellant contended that this testimony should be disregarded by the jury, for the reason that the witness did not show himself competent to give testimony as to the reasonableness of the compensation paid to the company's employees. *Held,* that it did not require an expert to testify to the fact of these reductions; that they could be proven by any person who knew of the same.

IDEM—ECONOMICAL MANAGEMENT—EVIDENCE. Upon the issue of economical management, testimony was offered by the plaintiff showing that wood, ties, lumber, etc., could have been purchased and delivered at the appellant's road at prices much below those paid by the company. *Held,* that the jury were justified in considering the testimony and that it tended to support the verdict; also, that it was incumbent on the appellant, when attacked in this matter, to show, if such were the fact, that the purchases made, on account of convenience and difference of expense in transportation to points of use, were the cheaper, as such proof was peculiarly within its control.

IDEM—CURRENT RATE OF INTEREST. The evidence offered as to the rate of interest merely showing that it ranged from six to twelve per cent, without any indication as to the kind or character of loan, and in the absence of testimony showing the current rate upon permanent investments other than mortgage securities and bonds, which bore six per cent, the jury was justified in finding that six per cent was the current rate upon investments of this character.

IDEM—QUESTIONS OF MANAGEMENT AND OF INTEREST—QUESTIONS OF FACT. All questions relative to the economical management, for the purpose of determining the income, and questions relative to the rate of interest, as a basis of capitalization under the rule, are questions of fact to be determined by the trial court.

IDEM—TENDER—PENALTIES. If a taxpayer wishes to be relieved of the penalties fixed by law, by a legal tender of the amount of taxes due, when that amount, under the issues and the law, is to be determined by a court or jury, it is incumbent upon such taxpayer to make a sufficient tender.

APPEAL from the District Court of the State of Nevada, Washoe county; *A. E. Cheney*, District Judge:

[For opinion on former appeal of this case, see 23 Nev. 283.]

Suit by the State against the Virginia and Truckee Railroad Company, *et al.*, for collection of taxes. From a judgment for plaintiff and an order refusing a new trial defendants appeal. Affirmed.

The facts sufficiently appear in the opinion.

*W. E. F. Deal*, for Appellants:

I.   The district court erred in including interest in this judgment, as no interest was prayed for in the complaint. (*Solen* v. *V. & T. R. R. Co.*, 15 Nev. 313, and cases cited.)

II.   The district court erred in including in the judgment $307 12, the same being 5 per cent on $6,142 33, for district attorney's fees, there being no statute or other authorization for the collection of any such fees.

III.   The district court erred in including in the judgment penalties of ten and twenty-five per cent upon what the taxes levied for the fiscal year 1896 would have amounted to if the property had been assessed at the sum of $212,300, found by the jury to be the value of the property in question. These penalties are included in and form part of the sum of $6,142 33, for which the judgment was rendered.

IV.   The levy required that all the taxes as assessed shall be collected and paid at the same time and in the same manner as provided by the revenue laws of the state. Under these laws no taxpayer could pay, and no tax collector could receive, any less than the full amount of taxes assessed. The failure to pay the whole amount assessed before taxes become delinquent is, under the law, punished by penalties amounting to ten per cent upon the amount of the tax, and if not paid with the ten per cent added within the time allowed by law, an additional twenty-five per cent is added as further

penalty.   Such penal provisions must be strictly construed.
(Cooley on Taxation, p. 359.)   These enormous penalties can
only be collected in cases of non-payment of a legal tax.
The whole tax must be legal to authorize the imposition of
penalties.   (*Worthen* v. *Badgett,* 32 Ark. 532; *State* v. *St.
Louis R. R. Co.,* 71 Mo. 88; *Lake Shore R. R. Co.* v. *People,*
46 Mich. 193; *Pike* v. *Cummings,* 36 Oh. St. 214; *The State,
ex rel. Pettis Co.,* v. *Union Trust Company,* 68 Mo. 463; *City of
San Antonio* v. *Raley,* 32 Southwestern Rep. 180; Cooley on
Taxation, 2d ed. 429 and 430; Blackwell on Tax Titles, 5th
ed., secs. 312 and 213.)

V.   But for the saving clause in the fifth subdivision of
section 52 of the revenue act, as amended by section 1 of
the act of 1895 (Statutes of 1895, p. 39), the whole assess-
ment against the property of defendants would have been
null and void.   This saving clause provides that when the
defense is based upon the ground that the assessment is
above the value of the property, the defense shall only be
effectual as to the proportion of the tax upon such excess
of valuation, but in no case shall an entire assessment be
void.   The verdict of the jury established the defense to
this action, made upon the ground that the assessment is
above the value of defendants' property, and such defense is
effectual as to the taxes upon $42,025, the excess of valua-
tion of the assessor, and the assessment as to such excess is
void, and no part of the assessment is saved, except upon
$232,200, the taxes upon which amount, without penalties,
are all that plaintiff is entitled to receive, if the verdict can
stand at all.   The penalties imposed by the statutes are for
the non-payment of the taxes upon the amount of the
assessment as made by the assessor, and judgment therefor
cannot be recovered, except when the whole assessment is
valid.

VI.   The court erred in permitting the witness, E. B. Yer-
ington, to answer the question set forth in assignment of
errors of law, No. 15, and in refusing to strike out his
answers to those questions as set forth in assignment No.
16.   The object of plaintiff's counsel by the questions was
to show that the salaries paid to the officers of the corpora-
tion were more than they should have been, so as to claim

the net income for the year in question was not so large as it would have been. The testimony of Mr. Yerington had no bearing on the question of the value of these services, nor had the fact that the officers had other occupations, which paid them, any bearing upon the matter. These officers were able to serve the corporation for the salaries paid them by reason of the fact that they had another source of revenue. Such testimony could not have resulted otherwise than to mislead the jury, and it was entirely immaterial.

VII. The district court erred in refusing to permit the witness, E. B. Yerington, to testify as to the amount of taxes of the corporation on its property, both paid and unpaid for the year 1896. The court had admitted evidence on the part of the plaintiff as to the receipts of defendant for the year 1896 and also of expenses. The evidence had gone to the jury, and it was proper on cross-examination to show what part of the taxes for the year 1896, the whole of which was a lien upon the property from the first of that year, had been paid and what was unpaid and admitted to be due, so that the actual result of the business for the year 1896 should be shown; otherwise, proper payments would be, as they were on the trial, kept from the jury, and the jury was practically left to arrive at the result of the year's business with a large item of expense omitted.

VIII. The court erred in permitting the witness, George Shaeffer, to testify as to the prices charged at Reno for certain articles similar to supplies purchased at Carson and used by defendant in the year 1895, as set forth in the 21st assignment of errors of law, and in refusing to strike out the testimony in rebuttal introduced for the purpose of showing that the management of the corporation for the year 1895 was not economical, for the reason that such testimony was incompetent, irrelevant and immaterial, and there was no testimony in the case showing or tending to show that the prices paid were unreasonable, and there was no evidence introduced tending to show that it would have been more economical for the defendant to have made its purchases at Reno than at Carson, nor that if such purchases had been made at Reno the result would have been a saving to defendant, or that the prices paid at Carson were unrea-

sonable. On cross-examination the witness, B. H. McClure, testified as to the supplies purchased at Carson and the prices paid therefor and the prices of similar articles at Reno. The machine shop, engine house, offices and principal place of business of defendant was at Carson, which was thirty miles distant from Reno. There was no showing whatever made of the cost of hauling the supplies from Reno to Carson or to other places on the road where they were to be used, and there was an utter lack of any connection between the two facts, but the jury were left to infer from the bare fact of the difference in prices in the two places that the management was not economical. Such a conclusion is illogical, the premises being wanting. The court can readily see how such testimony misled the jury, and what an opportunity there was for appealing to the natural prejudice of a jury against pretended discrimination against the market of Reno. The testimony should all have been stricken out, as, without proof of the fact that the prices paid at Carson were unreasonable, such evidence was immaterial. No such evidence was introduced. In order to show that the prices paid were unreasonable it was necessary to show that the articles purchased at Reno were as convenient for use as those at Carson and what the cost of delivering them was from Reno to the places where they were to be used. Suppose articles used by defendant which were purchased at Carson could have been purchased at Truckee or San Francisco at less price than was paid at Carson, could such evidence be admitted without proof of the cost of bringing them from these other points to the places where they were used? No testimony of the kind was offered.

IX. The district court erred in giving instruction No. 5 requested by plaintiff. The necessary cost of replacing the wooden bridge over the Truckee river was a part of the current expenses for the fiscal year from June 30, 1894, to June 30, 1895, and should have been deducted from the receipts in order to determine the net income for the year 1895. This court so decided in *State* v. *V. & T. R. R. Co.*, 46 Pac. Rep. 726.

X. The district court erred in the instructions which it gave of its own motion, with reference to the management of

defendant's road. The management required of defendant does not mean a management conducted with that care and diligence and attention which an ordinary, careful and prudent person qualified to perform such would take and exercise if the property so managed was his own. It means such management as does not result in willful or intentional extravagance, and such management as defendant was obliged to exercise under the law, and which it does exercise, though it may have resulted in less net income than might have been secured under different management, was an economical management. The instructions of the court allow nothing for the errors of judgment of the managers of defendant's road, nor for their mistakes. The jury were practically directed under this instruction to substitute their own judgment in place of that of the defendant corporation and its officers in determining how the defendant's road should or could have been managed, and instructed them in effect that the defendant's railroad was not economically managed, if in their judgment the road had been managed in a different way from that shown by the evidence, and instructed them whether the receipts and expenses actually had and incurred were such as might or should have been received under reasonably economical and prudent management, that they should take into consideration all the facts and circumstances shown by the evidence from the standpoint of the time and place where they were received and incurred. In other words, if the jury came to the conclusion that the defendant's wood, lumber, ties and other supplies could have been bought cheaper at Reno than at Carson, they must conclude that the management was not economical. There was no evidence except as to the prices paid at those two places, and the jury were authorized under the instruction to reach the conclusion that the road was not economically managed from the time and place where such supplies were purchased, without taking into consideration the expense of hauling such supplies over the whole road, without considering where it was most convenient to the defendant to get supplies, and without considering any other matter except as stated in the instruction.

XI. The net income of the road for the railroad year

1894–5 was, without deducting the cost of the bridge over the Truckee river, less than $34,000. The current rate of interest was shown without conflict to be eight per cent per annum. The income, capitalized at eight per cent, would make the value of the track and rolling stock to be $425,000, a little more than double the valuation placed by the jury on the track in Washoe county alone. The cost of the bridge must be deducted from the net income as stated in the report to the state, which would leave less than $28,000, which capitalized at eight per cent would make the value of the whole road, including rolling stock, $350,000—only $133,700 more than the jury found to be the value of all of defendant's property in Washoe county.

XII. The average net income for the years 1893–4, 1894–5, 1895–6 was not greater than $19,000 a year. To justify such a valuation as was placed by the jury, the net income of the road would have to be eight per cent per annum on $650,000, which is $52,000, nearly three times as much as the average for three years, and nearly double what it was in the year 1895. In order to show that the net income was not what it should have been, the plaintiff, not attempting to justify the action of the assessor in any direct manner, attempted to show mismanagement or management that was not economical, as defined by the instructions of the court, which the court will see were applied in the various rulings of the court in its rulings upon the introduction of testimony at the trial.

XIII. As to every claim, except that with reference to the items set forth in the annual report for 1894–5 which, it is claimed, should be added, the evidence offered in support of them was entirely irrelevant and immaterial, unless a property owner is to be assessed and taxed, not upon the actual value of his property, but upon what it ought to have been worth in the opinion of some one else by some other management, under the theory that if the property has not yielded as much as it could yield, the possible result of some other management should be the basis and not what was the actual fact.

XIV. The evidence as to the prices which the defendant paid for supplies and the prices of such supplies at Reno does not raise any conflict, because there is an utter lack of

anything connecting the two. It does not follow that because the same articles could have been bought at Reno for a less price than at Carson, where defendant bought its supplies, it would have been more economical for the defendant to have bought at the cheaper place, as the whole matter of the difference of expense in getting them to Carson and other points of use on the road, and the convenience of those managing the road are left out of the question. Were the machine shops at Reno, or the round-house or offices at Reno? The jury were left to jump at the conclusion that, because of the difference in prices at the two places, the road was mismanaged. It is not upon conjecture, but upon proofs, that verdicts of juries can be sustained. And if any inference could possibly be drawn against the management of the company, the errors of judgment and mistakes of a prudent business man are, under such proofs as construed by the district court, of no avail to the defendant.

*James R. Judge*, Attorney-General, *T. V. Julien*, District Attorney, *F. H. Norcross*, ex-District Attorney, and *Torreyson & Summerfield*, for Respondent:

I. The district court did not err in including interest in the judgment. The complaint was in the statutory form. "Section 1112, Gen. Stats., makes the civil practice act applicable in tax suits. Section 4903 means that interest shall be allowed at the legal rate on all moneys after they become due, on any judgment recovered before any court in this state." (*State* v. *Diamond Valley L. S. & L. Co.*, 21 Nev. 86.)

II. The case of *Solen* v. *V. & T. R. R. Co.*, in 14 Nev. 405, and in 15 Nev. 313, and that of *Hastings* v. *Johnson*, 1 Nev. 613, do not support appellant's contention. They simply hold that an execution must follow the judgment upon which it is issued and that if interest is not included in the judgment it cannot be claimed in the execution. In the case at bar the judgment calls for interest at the legal rate. Appellant's error lies in confounding a claim of interest in a complaint, which the law does not require in order to obviate a waiver, with a claim of interest in an execution, which the law does not allow unless included in the judgment.

III.   Appellant's contention that the judgment for $307 12 as district attorney's fee, and being five per centum upon the taxes and penalties, is unauthorized by law, cannot be considered as being well taken.   The penalties follow as a direct and inevitable legal consequence from the right to recover the tax itself.  (*State* v. *Cal. M. Co.*, 15 Nev. 234.)   Under the revenue act previous to that of 1891 this court held that the ten per centum penalty did not apply to suits brought for the collection of delinquent taxes on the proceeds of mines.   (*State* v. *Cal. M. Co.*, 13 Nev. 203.)   It was however expressly held that the district attorney fee of five per centum attached in such cases to the twenty-five per centum penalty as well as to the original delinquency.   (*State* v. *Cal. M. Co.*, 13 Nev. 289.)   The revenue act of 1891 contains the same literal provisions governing the collection of delinquent taxes and penalties by suit found in the preceding revenue acts in force when the foregoing cases were decided.   The case at bar if not a suit for the collection of delinquent taxes upon the proceeds of mines and the ten per centum penalty is in the same category as the twenty-five per centum penalty.

IV.   A comparison and analysis of sections 48, 49 and 65 of the revenue act of 1891 clearly and conclusively show that the five per centum district attorney's fee attaches to the taxes and penalties considered as a gross amount.   Even if the five per centum district attorney's fee should be unauthorized upon one or both of the penalties, this court can order the judgment modified, or disregard the point under the salutary maxim:   *De minimis non curat lex.*   (*Wilson* v. *McEvoy*, 25 Cal. 175; *McConile* v. *N. Y. & E. R. Co.*, 20 N. Y. 495.)

V.   The district court did not err in rendering a judgment for ten and for twenty-five per centum of penalties upon the delinquent taxes based upon the valuation of appellant's property in 1895 as found by the jury and the trial court. Appellant tendered to respondent in full payment of taxes in Washoe county for the year 1895 the sum of $3,173 88, and no more.   This tender was upon the basis of a valuation of $5,000 a mile for main track and $1,000 a mile for side track.   The tender, to have been sufficient in amount,

should have been upon a basis of valuation of $8,000 a mile for main track and $2,000 a mile for side track. A tender to be valid as a defense must be sufficient in amount. *(San Pedro Lumber Co.* v. *Reynolds*, 111 Cal. 598; 25 Am. & Eng. Ency. 901, and citations.)

VI. The provisions of the civil practice act, so far as applicable, are made specially applicable to suits to recover delinquent taxes and penalties. It was incumbent upon appellant to make a sufficient tender in order to avoid the payment of penalties, and this it failed to do. It had to stand or fall by the sufficiency of its tender. If its estimate of the value of its property in Washoe county had been correct, its tender would have been sufficient and penalties could not have been collected. "The tender of a part on condition that it be received for the whole does not relieve defendant from the payment of the entire penalties." *(State* v. *Carson Savings Bank*, 17 Nev. 165.)

VII. Under the provisions of the amendatory act of March 23, 1895, it is expressly enacted that "that the defense shall *only* be effectual as to the proportion of the tax based upon such excess of valuation." That is to say, in the case at bar, appellant's defense was effectual *only* in avoiding taxes and penalties upon the sums of $1500 a mile on main track and $1000 a mile on side track. The defense being effectual *only* for these amounts, its liability for taxes and penalties for the remaining valuation of its property is measured by the sufficiency or insufficiency of its tender.

VIII. In *Worthen* v. *Badgett*, 32 Ark. 532, the court held that penalties upon the legal tax for 1875 must be paid, but that no penalties need be paid for certain other illegal taxes, and that there could be no compounding of penalties. In *State* v. *St. Louis R. R. Co.*, 71 Mo. 88, the court held it to be error to give judgment for penalties and attorney's fee on delinquent taxes which were illegal because the levy was at the rate of the year 1874 instead of that of the year 1875 as fixed by statute. In *Lake Shore R. R. Co.* v. *People*, 46 Mich. 193, the court held interest not allowable upon an illegally levied tax. In *Pike* v. *Cummings*, 36 Ohio St. 213, the court held that penalties did not attach upon delinquent installments of a tax for street improvements when the

amount of paid installments exceeded the legal rate. In *State* v. *Union Trust Co.*, 68 Mo. 463, the court held taxes and penalties could not be collected upon a void assessment, the levy rate being different from that fixed by statute. In *City of Antonio* v. *Raley*, 32 Southwestern, 180, the court held that the taxes and penalties could not be collected because the levy rate was $1 05 on each $100, instead of being $1 on each $100, as fixed by law, and also held that a municipality could not enforce a penalty for the non-payment of taxes unless so authorized by its charter, no such authority being conferred by the San Antonio charter.

IX. The question whether appellant's management of the railroad was economical in 1895 was an issue in the case under the pleadings, and was one of the most hotly contested issues in the trial. The former opinion of this court in this case clearly expresses the relevancy of such testimony as would affect the economic management of appellant's railroad. It was eminently proper to show that such an unnecessary number of officers and stipendiaries were employed by appellant under salary that they had ample time to engage in other occupations and perform other services. It was for the jury and the trial court to decide under such testimony whether appellant's expenses could not have been decreased by employing only such a number of officers as could manage its affairs properly by devoting their entire time to its affairs instead of so greatly diversifying their energies.

X. The trial court did not err in disallowing the witness, E. B. Yerington, to testify to the amount of taxes paid and unpaid on appellant's property in the year 1896. The testimony was offered for the express purpose of retrospectively affecting the valuation of appellant's property in the year 1895. The taxes should not be deducted as an expense in obtaining the net earnings for capitalization at current rates of interest to ascertain an element of assessable valuation of a railroad. This point is considered in a subsequent subdivision of this brief.

XI. The admission of the testimony of witness Schaeffer, showing the price of lumber, ties, timber and mill supplies, at Reno during the year 1895, was not error. This testimony

and all other of similar character was of the most vital materiality under the issue of economical management of the railroad raised by the pleading of the action. It was an admitted fact that the entire length of appellant's road was only 51.75 miles. The materials were used all over the entire length of the railroad, and their delivery at the terminal or at intermediate points of a railroad of that length could not materially affect the cost of their distribution, and whatever such cost would have been was a proper matter for appellant to have shown in rebuttal. The evidence of the witness Schaeffer, an experienced lumber dealer and millman, when compared with that of witness McClure, the bookkeeper of the Carson and Tahoe Lumber and Flume Co., shows an enormous difference in the prices of lumber, ties, timber, mill supplies and wood, as is shown in detail hereafter.

XII.   Instruction No. 5 requested by respondent and given by the trial court is correct. The general revenue act of the state makes the calendar year the fiscal year for the purposes of taxation. (Stats. 1891, p. 135, secs. 1 and 2.)   The statute controls and railroad companies have no more right to subordinate the statutory fiscal year to a different fiscal year of its own invention than ranchers have to adopt a fiscal year dating from the full of the harvest moon, or members of the Methodist Church have to adopt one dating from the birthday of John Wesley and insist that it shall prevail against the fiscal year fixed by law. Appellant's witness, E. B. Yerington, its secretary and auditor, admitted that the expense of the Truckee river bridge was paid by appellant in December, 1894. This court in its opinion upon the former appeal expressly held that the cost of the bridge was an expense for the year 1894. (46 Pac. 726.)

XIII.   The instruction given by the trial court of its own motion definitive of economical management was a correct expression of the law, and was liberally favorable to appellant. Appellant's contention that the management required by law is simply a management free from *willful* or *intentional* profligacy does not commend itself to the reasonable mind. *Intent* may be, and generally is, an indispensable element in criminal procedure, but in civil actions it is unim-

portant in measuring liabilities, except in cases of punitive damages, and its position in the syllogism of cause and effect is generally occupied by the premise of negligence. The presumption always is that no one entrusted with the care and management of property will maliciously decrease its earning capacity. In the case at bar it is a matter of no moment whatever whether the bad management was intentional or merely negligently extravagant in expenditures and penurious or indolent in enterprise. The result in affecting the net earning capacity of the railroad was the same in either event.

XIV. For the calendar year in 1895, which, under the statute hereinbefore cited, must control, appellant's own books show that the total receipts from all sources were $229,656 58, and the total expenses, including taxes, were $194,719 77, leaving a net income of $34,936 81. This amount of $34,936 81, after deducting the delinquent taxes in Washoe and Storey counties, appellant contends should be capitalized at what it claims to be current rates of interest and that the result of such capitalization is the exact value of the entire railroad. *Eo converso*, the respondent strenuously insists that the railroad was not economically and prudently managed and operated, and that the net income could have been, and ought to have been, much greater, and that for the purpose this principal element constituting the value of the railroad an amount equal to what the net income ought to have been should have been taken as the percentage basis of capitalization instead of the amount which is only about one-half of what it should have been.

XV. Appellant deducts from its gross earnings for the year 1895 the entire amount of expenditure for supplies, and ignoring the difference in its own invoice of the value of the stock on hand in the year 1895 and that of the corresponding date in the year 1894. This is manifestly deceptive and improper. In 1894 the invoice value of the stock on hand was $154,544 33, but in 1895 it had increased to $158,160 58. It therefore follows that not only was the stock of supplies kept replenished, but that it was *increased* $3,616 25. This amount was expended out of the earnings for the year 1895, and the net income for that year was thereby *reduced* by that

amount. The railroad, however, had an *equivalent* for this sum of money, and was not made any less valuable because that sum went into *stock* instead of into *cash*. It is very apparent, therefore, that this sum of $3,616 25 should be treated as a part of the net earnings of the railroad for the year 1895, because it in reality represents an additional earning of that value.

XVI. Early in the year 1896 a reduction in the general officers' salaries was made which effected a saving of $3,785 per annum in the special payroll alone. Appellant was unable to offer the trace of a reason why this reduction was not made a year before. The most ordinary economy required that it should have been done, and, if it had been, the net income of the railroad would have been increased by the sum of $3,785. This amount should be added to appellant's admitted net earnings for 1895.

XVII. The general payroll for seven months of the year 1896 amounted in the aggregate to the sum of $52,789 05. The estimate for the whole year of 1896 upon this basis would be the sum of $90,495 60. The general payroll for the corresponding seven months of the year 1895 amounted to the sum of $58,674 38. The entire year upon that basis amounted to the sum of $100,584 60. Mr. E. B. Yerington, appellant's secretary and auditor, testified that there was no material difference in the traffic operations and volume of business in 1895 and 1896. He testified in the same connection that it did not necessarily require any greater number of operatives in 1895 than it did in 1896. These facts being established by appellant's principal witness, the jury was confronted with the question why under such conditions it cost appellant $10,089 more on the general payroll to operate its railroad during the year 1895 than it did during the year 1896, and it was proper that it should determine whether the difference was not a loss attributable to bad management. Respondent should not be compelled to suffer because appellant delayed the practice of reasonable and prudent economy, and it has a right to insist that this loss of $10,089 should be added to appellant's admitted net earnings for the year 1895.

XVIII. During the year 1895 appellant purchased for use

in operating its railroad 6,470 cords of wood. It paid to the Carson and Tahoe Lumber and Flume Company for this wood the sum of $5 15 a cord. The $5 15 a cord was paid for the wood as it laid in the yard and did not include loading on the cars. It appeared that appellant's general superintendent was interested in the management and control of the affairs of the Carson and Tahoe Flume Company, and that he and appellant's president were stockholders therein. Witness John M. Fulton, who certainly showed that he was as friendly to appellant as to respondent, testified that such wood during the year 1895 could have been delivered to appellant upon its tracks at Reno for $3 85 a cord. Witness Longabaugh testified that during the year 1895 he had from 7,000 to 10,000 cords of better wood for generating steam than was that of the Carson and Tahoe Lumber and Flume Company's wood at Empire, only three miles distant from the flume company's yards, and with appellant's spur tracks running through his yards, and that the wood was for sale for $4 a cord. He further testified that not only did appellant make no inquiries about the price of the wood, but that he ineffectually endeavored to sell the wood to appellant at that price. The gross malmanagement resulted in a loss to appellant of $1 15 a cord, accepting the testimony of Mr. Longabaugh in preference to that of Mr. Fulton. Six thousand four hundred and seventy cords at $1 15 a cord equals the sum of $7,440, which clearly should be added to appellant's admitted net earnings.

XIX. During the year 1895 appellant purchased from the Carson and Tahoe Lumber and Flume Company 193,194 feet of lumber, paying for the same the sum of $17 50 per M; 609,024 feet of No. 1 ties at $16 per M; and 58,234 feet of No. 2 ties at $12 per M. It was shown by witness Schaeffer, an experienced lumber dealer and millman, that during that year the price laid down at Reno was $12 per M for lumber; $12 per M for No. 1 ties, and $7 50 per M for No. 2 ties. The difference in prices were $5 50 per M for lumber, $4 00 per M for No. 1 ties, and $4 50 per M for No. 2 ties. A simple calculation based upon these figures shows that appellant squandered the sum of $3,760 72 upon the

items of ties and lumber alone during the year 1895, which should be added to its admitted net earnings.

XX.  Appellant includes as an item of its operating expenses during the year 1895 the sum of $7,421 38 for taxes paid.  Appellant also insists that there should be deducted from $34,936 81, its net earnings for the year 1895, the sum of $6,898 23, being the amount of its unpaid taxes for that year in Storey and Washoe counties upon the basis of its tender.  That appellant's premises are radically erroneous, and that taxes *should not be deducted* from appellant's gross earnings in order to ascertain its net earnings for capitalization at the current rates of interest, *is perfectly obvious*.  Taxes are no part of the *operating* expenses of a railroad.  Without including taxes, suppose the net earnings of the railroad were capitalized at current rates of interest and appellant had during the year 1895 owned that amount in gold coin instead of owning the railroad.  Under the statutes appellant would have to pay taxes at the levy rate upon the gold coin, or if it was loaned by appellant and secured by mortgage, appellant would have received for its gold coin only current rates of interest, and would have had to pay out of the same the taxes thereon at its face valuation.

XXI.  Appellant's net earnings during the year 1895 under reasonably economical and prudent management, as shown by the foregoing itemizations, should have been as follows:  Admitted net earnings, $34,936 81; increase of supplies, $3,616 25; increase of due from agencies, $2,884 01; increase of uncollected bills, $641 65; increase of due from S. P. Co., $313 98; increase of enterprise investment, $251; earning of fair train, $370; saving on special payroll, $3,785; saving on general payroll, $10,089; saving on wood, $7,440; saving on lumber and ties, $3,760 72; loss on free passes, $4,375; erroneously deducted taxes, $7,421 38.  Total, $79,-884 80.

XXII.  The testimony does not warrant a finding that

bank in Reno, of which he was a stockholder, purchased school bonds bearing only six per cent interest as a permanent investment. He also admitted that four per cent was all the interest the banks paid to depositors on time deposits. Witness Shearer testified that the records showed that six per cent was the prevailing interest rate charged by the Union Building and Loan Association in Reno, Nevada. All of the foregoing testimony was confined to the year 1895.

XXIII. We have ascertained from the evidence that under a reasonably prudent and economical management of appellant's railroad during the year 1895, its net earnings would have amounted to the sum of $79,884 80, and dividing that amount by six per cent, the current rate of interest, we ascertain the true value of appellant's entire railroad to be $1,361,413.

*W. E. F. Deal*, for Appellants, in reply:

I. Section 65 of the revenue act, Stats. 1891 p. 159, provides: " The district or prosecuting attorney shall be entitled, on each suit for the collection of delinquent taxes, to a fee of five dollars with five per cent on the amount delinquent. Said fee and percentage shall be taxed and collected as costs, but in no case to be charged against the county or state. " This section of the act does not help the respondent as to his contention as to the five per cent, as there was no amount delinquent. There was no valuation whatever upon which the tax could be ascertained until the jury by their verdict ascertained it. There was no valid assessment of any amount whatever until it was fixed by the jury, and when the jury by their verdict fixed the true cash value of the property which had never been fixed before, then for the first time was there any legal assessment whatever, and then only by the proviso of the statutes of 1895 the assessment for the sum fixed by the jury was made valid, the assessment for the excess being by the proviso made void. As a matter of fact the fee of five dollars and five per cent were never taxed as costs in this action. The judgment reads: " The sum of six thousand one hundred and forty-two dollars and $\frac{33}{100}$ dollars ($6,142$\frac{33}{100}$), together with five per cent of said sum for district attorney's fees,

amounting to the sum of three hundred and seven and $\frac{12}{100}$ dollars ($307 12), and for the further sum of five dollars for additional district attorney's fees and costs of this action." No costs were entered on the judgment, and respondent was not entitled to any, as there was no valid assessment made by the assessor. In addition to this, it is evident that these costs provided in section 65 were penalties, and were provided for to compensate the district attorneys for their services in counties where district attorneys were not salaried officers, and where they depended on the fees allowed by law for their compensation.

II. In Storey, Washoe and Ormsby counties the current rate of interest (that is, the interest generally charged) for the loan of money upon good security was not less than eight per cent. (Testimony of D. A. Bender, J. W. Eckley, R. S. Osburn.) Each one of these witnesses so testified, and there is nothing to the contrary in the record. Mr. Eckley testified that the Bank of California bought some bonds for some of its customers, issued in California, which paid six per cent interest. Such testimony did not tend to show what the current rate of interest was in Nevada. It was not only error to admit such testimony, but it was error in the court in refusing to give the instruction bearing upon this matter. D. A. Bender testified that in the case of one debtor the First National Bank at Reno took a mortgage for a debt that was entirely unsecured at a lower rate of interest than eight per cent, and that one investment of $10,000 in Reno school bonds was made which bore six per cent interest. Four per cent interest was paid on time deposits for six months when no security whatever was given for the payment. B. C. Shearer testified that the Union Building and Loan Association, dealing with its members alone, and not with the public at all, charged six per cent interest. Where is there in the record any testimony that the current rate of interest upon gilt edge security was eight per cent or over? These isolated cases only prove the general rate, and the court should have instructed the jury upon the subject as requested.

III. The error of the court in refusing to allow E. B. Yerington to testify to the amount of taxes paid and unpaid on

appellant's property in the year 1896, is clearly apparent from the decision of this court upon the former appeal. The court said (46 Pac. Rep. p. 725) that the sum of $6,898 23, the amount the defendant admitted to be due Storey and Washoe counties for taxes for the year 1895, should be deducted from $21,077 71, the estimated income for the year ending June 30, 1896. The taxes are due and payable in November of each year after the commencement of the railroad fiscal year from June to June. Those due and admitted to be due in November, 1896, were necessary to be shown in order to show what the net income of the road was from June 30, 1896, to the time of the trial, as they were payable out of the receipts for the fiscal year from June 30, 1896, to June 30, 1897.

IV. Savings on wood, $7,440; savings on lumber and ties, $3,760 72. The proof in regard to these items is that the machine shop, the round house, the manager's and general offices of defendant were at Carson; that it bought its supplies of this kind at Carson from the Carson and Tahoe Flume Company; that the flume company charged the same price to all of its customers as it did to the defendant for similar articles. The proof shows that these articles were purchased from month to month as needed. The record sets forth the payments each month. So far as the wood is concerned, the only proof as to Reno is that 9,000 cords could be contracted for at $3 85 a cord, and so far as Mr. Longabaugh is concerned, he was willing to close out his 10,000 cords of wood for $4, but he would not swear that he ever communicated the fact to any officer of defendant in 1895. He sold all of his wood at $5 per cord. It was at Empire, three miles from Carson, and there is no proof by any competent testimony that the offer was ever communicated to defendant or to any of its officers.

V. As to the item of the account on page 35 of the brief of counsel for respondent, " by erroneously deducted taxes, $7,421 38," it is not an open question in this case, having been fully disposed of on the former appeal. Not only was this item properly charged as a part of the expense of defendant, but the item of $6,898 23, admitted to be due and unpaid for the taxes of 1895, should be deducted if the calendar year

is the proper basis. The district court so instructed the jury. The item of $6,018, cost of bridge, should be deducted if the railroad fiscal year is the proper basis. Every business man takes into account the taxes paid by him in any year to ascertain what his net profits are. Every item of expense, insurance, taxes, and legal expenses incurred, must be deducted as a part of the necessary expense of conducting any business, otherwise the result would be a false one. (See 16 Am. & Eng. Ency. vol. 16, pp. 487, 488, and cases cited in notes.)

VI. The defendant asked the court to give the following instructions upon this matter which were refused: "If you believe from the evidence that the defendant diligently and skillfully carried on its business with a view of realizing as much from its business as it could do, your conclusion upon this matter should be that the business was economically managed, although you believe that if other methods had been used, a larger amount of money might have been realized." "If you believe from the evidence that any losses, if any were made by defendant by reason of paying too much for any supplies or charged too much or too little for freights or fares, you cannot on this account conclude that defendant's business was not economically managed, if you believe that such losses, if any, were made by mistake or bad judgment." "In determining whether any supplies could be purchased by defendants at a less price than was paid for those it did purchase in the year 1895, you must take into consideration the additional cost, if any, of hauling such supplies to the place where it was necessary for defendants to use them, and the failure to buy in a cheaper market cannot affect the question if such failure was caused by the exercise of bad judgment, if any such appears from the evidence." There is not a fact assumed in any of these instructions, and they were all applicable to the evidence in the case, and there were no other instructions which were at all calculated to call the attention of the jury to such evidence or to the rules of law applicable thereto. If an absolutely perfect management were required as contended for by counsel for respondent, and if defendant must be responsible for all errors of judgment and mistakes, and if it must have

such foresight as to know in advance how much supplies it must have on hand for future use, and if it must know whether a sum offered for a special train would equal or exceed what the defendant itself might have made if it had refused to enter into such a contract and had put on such a train itself, and if the employment of fewer men in one year is proof of extravagances in the preceding one, and if it must buy its supplies at the place where they are cheapest without reference to the cost of getting them to the place where they are to be used, and where they are to be handled, and if it must when it has the opportunity of buying wood at either Empire or Reno, or at any other place, at a cheaper price than at Carson, buy it without reference to its own convenience and the cost of transportation to the place where its works are, although in such purchase it must pay in cash or contract to pay nearly double its net income, then there may be some foundation for the contention of counsel for the respondent.

### ON PETITION FOR REHEARING.

*W. E. F. Deal,* for Appellants:

I.   There was one investment of $10,000 shown in county bonds at 6 per cent, and purchases by very few customers and in limited amounts, without time or amounts stated, of securities of foreign corporations. Such testimony does not even show that the current rate of interest on investments was 6 per cent without changing the meaning of current from general or common to special or unusual. The effect of the decision as to this case is light in comparison with the effect it will have in unsettling and making uncertain a rule established by this court for more than twenty years. It was not a disputed question of fact at all, upon this testimony, as to what the current rate of interest was. The witnesses, all of whom were men of long experience in financial matters, thoroughly understood what was meant by current rates of interest when asked what they were, and very promptly stated, when asked as to these purchases of county and other corporation bonds, that they were isolated investments of money, and not loans of money. · It would be a surprise to any one to learn that 8 per cent per annum

upon good security was charged anywhere in Nevada for the use of money. A rehearing of this case will, upon this matter, lead to a more careful examination of the record in this case, and will, it seems to me, show this court that upon this record the same result should follow as was reached in the former appeal upon a record the same substantially. This decision, instead of being consistent with the former decisions of this court, is utterly inconsistent with them. The testimony being the same, the result should be the same. The testimony does not even show that 6 per cent was the current rate of interest for investment unless one investment is covered by the word current.

II. If the court came to the conclusion that it was shown without contradiction that appellant did not necessarily require more officers and employees in the year 1895 than it did in the year 1896 from the testimony of Mr. E. B. Yerington, the court has misunderstood, not only his testimony, but the position which he occupied. He was the secretary and for part of the time covered by his testimony the paymaster and auditor of the company. He kept the books, and as to the items upon which this court has affirmed the judgment, he testified as follows: Q.—I presume you know nothing about any of these items except the mere bookkeeping part of it? A.—That is all; just the totals. The court below would not permit this witness to testify as to the reasonableness of the compensation paid to some of defendant's employees, upon the ground that he did not show himself competent to give such testimony. Will this court reverse or affirm a judgment upon the testimony of a witness who is incompetent to give testimony upon the fact in question? The witness had stated that he knew nothing about the items except the mere bookkeeping part of it. The testimony of the witness cannot be accepted when he testifies that he has no knowledge of the fact, and, if it is accepted, then his testimony that reductions in the force of employees was made whenever opportunity offered must also be accepted.

III. When the statute imposing penalties for non-payment of taxes, when due and payable, was adopted, the result of any successful defense against an assessment for

taxes would have been to relieve the taxpayer altogether from the payment of any tax. Laws imposing penalties are always subject to the strictest constructions; and laws providing remedies are always liberally construed. When the legislature provided, as it did in 1895, that a defendant in a suit to recover taxes might defend such an action by showing that the assessment is out of proportion to and above the actual cash value of the property assessed, it intended that such defense should be a complete one, and that if he should be successful, he would be amply protected against the illegal tax. In order that the state should not lose the whole of the taxes in such a suit, it was provided in the act " that in such last mentioned case, where the defense is based upon the ground that the assessment is above the value of the property, the defense shall only be effectual as to the proportion of the tax based upon such excess of valuation, but in no such case shall an entire assessment be declared void." The effect of the statute in a case where the defendant is successful is to leave him liable for the tax upon the true cash value of the property as established by the verdict of the jury, and to save the taxes upon that value to the state, which, but for the proviso, would be lost to the state. The effect of the judgment in this case is to absolutely deny to the successful defendant all the benefit conferred by the statute. The remedy in this case is worse than the disease. The diseased member is amputated, but the patient is left to bleed to death. To give the construction placed upon this statute by this court is to convert an intended benefit into an injury, which this court will not allow to stand. (*Gibson* v. *Jenney*, 15 Mass. 205.) It is not necessary to do more than to show the court, upon a petition for rehearing, that a fuller consideration should be given of the questions involved in the case than has been given, and this, I trust, I have succeeded in doing, as the record will support me in the contention I have made that the record on the former appeal was upon the matter of current rates of interest, the same substantially, as on this, and that upon the same facts the result should be the same, that the reduction in the pay of the officers and employees in 1896 was but little more than one-half the amount stated in the opinion, and that the evidence

in the record showed, without any contradiction, that the amounts paid in 1895 were necessarily paid; and that the construction given by the court to the statute of 1895 results not only in depriving a successful defendant in a tax suit from any benefit from such defense, but is an absolute injury.

*James F. Dennis*, also for Appellants:

I.  The court surely has not taken into consideration that the action is not one for debit or *in assumpsit*, as there was no denial of the right of plaintiff to collect taxes on defendant's property.  The only question to be determined is:  Was the property assessed for more than its actual cash value? Surely that was all the jury had to determine in the case, and on this question they found in favor of the defendant. It cannot be that the court intends to destroy the law by adding to such a judgment the penalties imposed.  If so, it would be saying to the taxpayers:  Though your property has been overvalued, and though you have been wronged by the state, if you seek redress in the courts, and prevail, the law will impose on you such a penalty that you had better suffer the wrong than to apply to the courts for a remedy.  The principle of costs and penalties is to punish wrongdoing, not to prohibit one from doing right.  The laws of this state, previous to the year 1895, did not permit of the defense here set up, but were such that the whole assessment must stand or fall on the action brought to enforce it; hence the imposition of penalties where the state prevailed.  But under the statute of 1895, a new defense was created to protect the property owners of the state against unjust overvaluation of their property, and the court must take this into consideration in determining the question of penalties.  To say that a litigant who failed to estimate the value of his property one dollar, when making a tender, should pay a penalty for such failure, when the state had overestimated his property $40,000 in making its assessment, seems wrong.  What person could tell the exact valuation a court or jury would place on his property; and yet every person believing himself wronged by an overvaluation would have to tender the exact amount, afterwards to be found by a court or jury, due

on a proper valuation of his property, or pay the penalties under the decision in the case, as it now stands.

II.  To give effect to the laws, which permits of the defense interposed in this case, the state should be held to have forfeited the penalties, when the defendant gets a better valuation of his property than that placed on it by the state, if he prevails on the question being litigated, just the same as a person suing on an account for one thousand dollars and only getting judgment for five hundred.  He prevails in the question being litigated.  So does the defendant here.

III.  Under the law as it stood previous to the amendment of 1895, the penalties attached as a natural consequence of the wrongdoing of the defendant; for, previous to that time, the valuation of his property had been adjudicated by the board of equalization, which was final, so that the decisions of our court on the question of penalties, in former cases, have no application in this case.  Under the old law, when determining the question of valuation of property before the board of equalization, no penalties were provided for, and no costs were exacted.  Every one had the right to appear then and litigate the question of valuation before that tribunal.  And the amendment to the law, in 1895, was only to permit an appeal from the determination, adjudication or decision of the board of equalization, on the question of the valuation of property, and permit the property owner to have that question settled for or against him by the courts.  The law of penalties should have no application, unless the valuation fixed by the board of equalization was found by the court or jury to be correct.

By the Court, BELKNAP, C. J.:

This is the second appeal in this case.  (46 Pac. 723.)

Appellant made the statutory statement to the assessor fixing the value of its main and side track in Washoe county at $131,800.  Notwithstanding this it was assessed at $254,200.

The answer alleged ·that the assessment was out of proportion to and above the actual cash value of the property, in compliance with the statute permitting this defense. (Stats. 1895, p. 139.)

The jury found the value to be $212,200. This is exclusive of rolling stock and other property valued at $19,900, concerning which there was no controversy. Judgment was entered upon the verdict together with penalties, and from the judgment and an order denying a motion for new trial an appeal has been taken.

The record of the former trial does not show that any point was made touching the time of the commencement of the fiscal year—whether in July or January. It seems to have been assumed upon that trial that it commenced upon the first day of July for the purpose of taxation of railroads. The district court instructed the jury that the fiscal year for the purpose of taxation commenced upon January 1st, and there does not appear to be any serious contention concerning the correctness of the instruction.

Upon the former appeal it was decided that the value of the railroad for the purposes of taxation should be determined mainly by its net earnings capitalized at the current rate of interest. In that case it was shown without contradiction that the current rate of interest was eight per cent per annum. In this, it was shown that the rate for loans was not lower than eight per cent, but for investments the rate was six per cent. Money or capital laid out in a permanent form, as in the construction of a railroad, the jury may have concluded was in the nature of an investment and not of a temporary loan, and the rate of interest should be the same as investments command. There was evidence to support either view of the case, and, as all intendments must be taken in support of the verdict in the absence of any express finding to the contrary, we conclude that the jury found the rate of interest to be six per cent per annum.

Appellant claims that its net income as shown by its books was not greater than $28,038 58. Respondent, in support of the judgment, claims that items omitted by appellant should be included in its income and that a greater income should be taken as the basis of capitalization.

It will only be necessary to consider one of these matters.

A reduction of the pay of the officers and employees of the company was effected in the month of May, 1896, by which the operating expenses of the road were reduced at the rate

of $13,839 per annum. It was shown without contradiction that appellant did not necessarily require more officers and employees in the year 1895 than it did in the year 1896. Under this showing it was competent for the jury to have found that the operating expenses of the year 1895 could have been by economical management reduced to the rate that had been subsequently established in 1896. The instruction given to the jury by the court upon its own motion upon this subject appears to be entirely unobjectionable. It is as follows:

"You are instructed that the net income of a railroad company when necessary to be determined for purposes of taxation, is the difference between the gross receipts and necessary expenses under reasonably economical and prudent management. By reasonably economical and prudent management is meant a management conducted with that care, diligence and attention which an ordinarily prudent and careful person, qualified to perform such, would take and exercise if the property so managed was his own. In any particular case, the gross receipts to be considered for said purpose, are not, necessarily, the receipts which were in fact received, but such receipts as would be received under a reasonably economical and prudent management; and the expenses to be deducted, in order to determine the net income, are not, necessarily, the expenses which were in fact incurred, but such expenses as would be incurred under a reasonably economical and prudent management."

Adding the sum of $13,839 to $28,038 we have as the net income of the road, in round numbers, $42,000. This sum capitalized at six per cent represents about $700,000, as the value of the entire road. Washoe county's proportion is about $260,000. As the value of the entire property in the county as fixed by the jury did not exceed $232,100 the property was not overvalued.

It is claimed that the penalties imposed by the statutes in tax cases are not legally enforceable in the present case because the assessment was rendered void by the verdict. Under the act of March 9, 1895 (Stats. 1895, p. 39), it is declared that "where the defense is based upon the ground that the assessment is above the value of the property, the defense shall only be effectual as to the proportion of the tax

based upon such excess, but in no case shall an entire assess-ment be declared void." And section 48 of the revenue law (Stats. 1891, p. 150) requires that, " in all suits brought for the collection of delinquent taxes, as provided for in the preceding section, the complaint and summons shall demand, and the judgment shall be entered for, twenty-five per centum in addition to the tax of ten per centum thereon and costs; and such tax, penalty and costs shall not be dis-charged, nor shall the judgment therefor be satisfied, except by the payment of the tax, original penalty, costs, and the additional penalty herein prescribed in full."

These provisions of the statutes answer appellant's con-tention.

Other points were argued by counsel, but in the view we take of the case they are not necessary to be considered.

The judgment and order are affirmed.

### UPON PETITION FOR REHEARING.

By the Court:

In passing upon the application for a rehearing filed in behalf of the appellants, we deem it necessary to briefly give a statement of the case and of the material facts appearing in the record, that there may not be any miscon-ception of the scope of the opinion, and that the question may be accurately stated.

This action was brought by the respondent to recover certain delinquent taxes, with penalties and attorney's fees under the statute, levied and assessed upon certain property of the Virginia and Truckee Railroad Company, in Washoe county, Nevada.

The appellants, by answer, admitted that the Virginia and Truckee Railroad Company was the owner of the prop-erty against which said taxes had been assessed; averred that said property within said county was of no greater value than $131,800, and denied certain other averments of the complaint.

It appears that in June, 1895, H. M. Yerington, general superintendent of said company, delivered to the assessor of Washoe county the statutory statement showing the amount,

character and valuation of the property belonging to said corporation subject to taxation within said county, in which statement the valuation of the main track was fixed by said superintendent at the sum of $128,250, and the valuation of the side track in said county was fixed at $3,550. The assessor valued the said main track at $243,675 and the said side track at $10,650. On the 27th day of September, 1895, the said company appeared before the board of county commissioners of Washoe county, sitting as a board of equalization, and asked, under a proper petition, a reduction of the value of said property from the sum of $274,225 to the sum of $151,704, which request, after hearing and consideration by the board, was refused. The tax becoming delinquent, this action was brought to recover the amount due, under the usual statutory form. Upon a second trial of the action in the district court under the pleadings, a jury found the value of the property in controversy to be $254,321, and from a judgment of the court in favor of the respondent, and from an order denying appellant's motion for a new trial, this appeal has been taken.

The important questions considered by this court upon the hearing of this appeal were as to the sufficiency of the evidence to justify the verdict of the jury, and certain errors of law. It is admitted that the original cost of construction of the company's entire line of railroad from Reno to Virginia City exceeds more than $3,000,000. It was shown by the testimony of Mr. W. H. Kirk, chief engineer of the defendant company, that the cost of constructing a railroad from Virginia to Reno in the year of 1895, equally as good for all the purposes for which the present railroad is designed, and over the same route, would exceed more than $1,000,000. It is vigorously contended on behalf of the appellant that under the rule announced by this court in the case of *The State of Nevada* v. *The C. P. R. R. Co.*, 10 Nev. 47, and reannounced in this case as reported in the 46 Pacific Reporter, 724, that the value fixed by the jury was in excess of the value shown by the testimony, and therefore not supported by the evidence. In the cases cited it was held that in determining the value of a railroad the first inquiry is to its actual cost, and that cost is its value;

but if it appears if the actual cost was in excess of the
necessary cost, the necessary cost is its proper value; and if
it further appears that the net income of the road does not
amount to current rates of interest on its necessary cost, and
is not likely to do so, or if the business of the road is likely
to be destroyed or impaired by competition or other cause,
or if the utility of the road is not equal to its cost, then its
value is less than its cost.   It is apparent from the record,
that the value of the Virginia and Truckee railroad cannot
be fixed at its actual cost.   The question then is whether the
value fixed upon the road, for the purposes of taxation, by
the jury, determined mainly by its net earnings capitalized
at the current rate of interest, is supported by the evidence.
The rule is too well established to require citation, that this
court will not disturb the verdict of a jury where there is
substantial conflict in the testimony.

The questions of fact tried and determined by the jury
were, the current rates of interest and whether the net
income of $25,000 for the year of 1895, claimed by the rail-
road company, was produced under a careful and economical
management and operation of said railroad.   In the original
brief, filed in behalf of appellants, it is admitted that the net
income of the road for the fiscal year of 1895 was about $28,000.
This court in its original opinion herein, in passing upon
this question, suggested that the reduction of the salaries of
the officers and employees of the company, effected in the
month of May, 1896, by which the operating expenses of
the road were reduced at the rate of $13,839 a year, showed
without contradiction that the appellants did not necessarily
require more officers and employees in the year 1895 than it
did in the year 1896, and that this sum added to the admitted
net income of the road would increase that amount to $42,000,
which capitalized at six per cent would represent $700,000 as
the value of the entire road, of which sum Washoe county's
proportion would be about $260,000.   The testimony relative
to this reduction in the pay of the employees and officers was
given by the secretary and bookkeeper of the corporation,
and counsel contends that this testimony shall be disregarded
and should have been disregarded by the jury for the reason
that the witness did not show himself competent to give

testimony as to the reasonableness of the compensation paid to defendant's employees.

We are of the opinion that it did not require an expert to testify to the fact of these reductions. The reductions were made by the corporation defendant, and that fact could be established by any witness having knowledge of the same. Coupled with this testimony the witness testified to the further facts that during the years of 1895 and 1896 there was not any material difference in the traffic operations of the road; that the number of tons handled by the corporation defendant was about the same during these years; that no more employees were required in 1895 to operate and manage the business than in 1896, and that no more officers and clerks were required for one year than for the other. No expert was required to establish these facts. They could be proven by any person who knew the same. If, then, this statement of facts by the witness is true, the jury could very reasonably infer that the net income of the road for the year of 1895, under an economical management, should be increased to an amount of more than $13,000, without imputing bad faith to the company or its management. The same witness, when asked to give a reason for the reduction, answered that the reduction was made on account of hard times generally, and hard times for the railroad particularly, yet the condition during these two years was practically the same in the operation of the road. Some contention is made by counsel with reference to the amount of the reduction that was actually made in 1896, and, from the statement furnished in counsel's brief, we frankly admit that we are unable to give the exact amount.

Other testimony was presented to the jury relative to the economical management of this road during the year of 1895, which tends to support the verdict of the jury, which we did not deem it necessary to consider on the hearing of this appeal. It appears that during the year of 1895 the corporation purchased for use in operating its railroad 6,470 cords of wood, for which the company paid at the rate of $5 15 per cord, delivered at the company's road. Further testimony was introduced showing that during the same period such wood could have been purchased by

the corporation, delivered at its tracks for $3 85 per cord, thereby increasing the net income for the fiscal year of 1895 to an amount of $7,440. Evidence was further introduced to establish the fact that in the purchase of lumber and ties for the use of the road during the year of 1895, a considerable sum could have been saved to be added to the income of the road. This testimony was before the jury, and without saying what weight it should have received, or without passing upon credibility of the witnesses who gave the testimony, and without discussing the reasons for these purchases, we are of the opinion that the jury were justified in considering the testimony and that the testimony tends to support its verdict. It is true that the appellants contend that it does not follow because these supplies could have been purchased at some other place for a less price than where they were purchased, it would have been more economical for the defendant to have purchased at the cheaper place, as the whole matter of difference of expense in getting them to the various points of use on the road and the convenience of those managing the road are left out of the question. This position is not tenable, as it was incumbent upon the appellant, when attacked in this matter to show that the purchases made, on account of convenience and difference of expense in transportation to points of use, were the cheaper, and such proof was peculiarly within its control.

Without going into the testimony upon other items that respondent contends should be considered as a part of the net income of the road for the fiscal year of 1895, and without discussing the merits of these items, we must still hold that the record discloses testimony sufficient to sustain the verdict of the jury as to the net income for that year under an economical management. This was a question of fact to be determined by the jury, and there being evidence in support of their verdict, substantial evidence, evidence that creates a conflict, we cannot disturb the verdict.

With reference to the rate of interest in the counties in which the road is situated, the appellants contend that the evidence upon the former appeal of this case was substantially the same as in this appeal, and that the evidence in this appeal did not justify this court in concluding that

there was evidence authorizing the jury in fixing a lower rate than eight per cent. We are not prepared to say in this opinion what the testimony was on the former trial of this action, neither are we prepared to say that the jury fixed or determined the rate at six per cent. Upon the question of interest the testimony in some respects is not complete, as the testimony does not develop the character of loans upon which interest charges range from eight to twelve per cent. It does not appear what rates are charged upon short time loans based upon personal security, or upon long time loans made upon mortgage security, or rates of interest usually charged upon open and unsecured accounts. It does appear that bonds are issued and sold bearing six per cent interest, and that loans made by a private corporation to its own members upon mortgage securities bear the same rate.

It is not necessary to quibble on the meaning given by this court to the word " current," as its meaning is well established by authority and use. The current rate of interest upon short time loans or upon personal security may be a certain per cent, and the current rate of interest upon long time loans with ample security will be different; also the current rate of interest upon permanent investments, such as railroads, may be different from the current rate upon loans and investments. Taking the testimony as presented by the record, there is nothing shown as to what the current rate of interest in the counties wherein this road is situated is upon property of this character, and the evidence offered as to the rate of interest ranging from six to twelve per cent without any indication as to the character or kind of loan, and in the absence of testimony showing the current rate upon permanent investments other than the rate upon mortgage security and bonds, we still feel justified in saying that under such testimony the jury were authorized in finding six per cent as the current rate upon investments of this character.

It seems to us that while the testimony was meager as to the character of the investments upon which the various rates were or might have been charged, yet there is sufficient testimony to justify the jury in finding that six per cent was the current rate upon investments of this character.

We must therefore conclude that under the rule announced in the case of *The State* v. *The C. P. R. R. Co.*, *supra*, and in the case of *The State* v. *The V. & T. R. R. Co.*, *supra*, that all questions relative to the economical management of the road for the purpose of determining the net income of the road, and all questions relative to the rate of interest, as a basis of capitalization under the rule, are questions of fact to be submitted to and determined by the court or jury trying the cause. Otherwise the taxpayer in the management of his business could to a great extent defeat the state in its effort to collect valid taxes. In determining these questions a jury have a right, as we think, to inquire into the salaries paid officials of a company, and into the price for supplies and materials and the rates of wages paid to employees. Therefore where the testimony shows that excessive prices have been paid for supplies, that reductions could be made in the payment of official salaries, a jury have a right to consider such evidence in determining what should be the net income of the road based upon economical management, and where such question has been determined by the jury under evidence in which there is material conflict, this court will not interfere.

Appellants further contend that it was error to allow the penalties provided for by law as a part of the judgment. We cannot sustain this contention. Under the provisions of our revenue law all taxes which have not been paid on or or before the first Monday in December become delinquent and subject to a penalty of ten per centum upon the amount due, and that in all suits brought for the collection of such taxes the complaint and summons shall demand and the judgment shall be entered for twenty-five per centum in addition to the tax of ten per centum thereon and costs, and such tax, penalty and costs shall not be discharged, nor shall the judgment therefor be satisfied except by the payment of the tax, original penalty, costs and the additional penalty prescribed. (Stats. of Nevada, 1891, pp. 146–151.)

The case presented stands as follows: A tax had been duly levied; the property of the defendant corporation upon the return of the statutory statement of its general superintendent had been made to the county assessor of Washoe

county with a value fixed thereon; the assessor, in the discharge of his duty as required by law, fixed the value of said property for the purpose of taxation;. the defendant corporation, as was its right, appeared before the board of equalization of Washoe county and requested a reduction in the valuation fixed by the assessor; the board of equalization, acting upon the request of the defendant corporation, judicially determined, as it had authority to, that the assessed valuation made by the county assessor was proper. The corporation thereupon tendered to the county treasurer the amount of taxes which it considered to be due, based upon its own valuation, an amount less than that fixed by the board of county commissioners and the assessor. The county treasurer was not authorized and had no right to accept a less amount than the sum legally determined to be due, and upon the failure of the railroad company to pay that amount on or before the time required by law, the taxes became delinquent, and upon the institution of the suit by the district attorney the additional penalties attached. Under the provisions of the law, where the defense is based upon the ground that the assessment is above the value of the property, the defense shall only be effectual as to the proportion of the tax based upon such excess of valuation, and in no case shall the entire assessment be declared void. The jury found by its verdict that a greater amount was due for taxes from the railroad company than the amount of its tender. If the railroad company wished to be relieved of the penalties fixed by the law by a legal tender of the amount of taxes due, where that amount under the issues and the law is to be determined by a court or jury, it was incumbent upon the company to make a sufficient tender. It must stand or fall by the sufficiency of its tender. Its estimate of the value of its property in Washoe county not being correct, as determined by the jury, its tender was not sufficient, and it could not be relieved of the penalties due upon the amounts found by the jury. (*State* v. *Carson Savings Bank*, 17 Nev. 146.)

No sufficient reasons appearing therefor, the petition for rehearing will be denied.

BONNIFIELD, J., concurring:

There are two petitions filed, on the part of the appellant for rehearing of the case on the question of the value of the property and the question of penalties. In one of the petitions it is argued, to wit: "The only question to be determined: Was the property assessed for more than its cash value? Surely that was all the jury had to determine in this case, and on this question they found for the defendant. It cannot be that the court intends to destroy the law by adding to such a judgment the penalties imposed. If so, it would be saying to the taxpayers: Though your property has been overvalued, and though you have been wronged by the state, if you seek redress in the courts, and prevail, the law will impose on you such penalties, that you had better suffer the wrong than to apply to the courts for a remedy."

The answer to the above is, that the question "Was the property assessed for more than its cash value?" was not the only question to be determined by the jury and the court, but the question to be determined was: "What was the cash value of the property at the time of its assessment for the year 1895?" Had the defendant in its answer on the question of value, simply, alleged that its property was overvalued, I am of opinion the court would have properly disregarded the answer as being frivolous. The plaintiff claimed that the property in question was of the value of $254,321. The defendant alleged by its answer that the value was only $131,800, and this value it undertook to maintain by evidence at the trial, and upon this theory of the value its defense to the action rested. The jury found that the value was $212,000, being $80,200 more than the value alleged by the defendant and on which its defense was based.

I am inclined to the opinion that it cannot be fairly claimed that on the question of value "the jury found for the defendant."

As to destroying the law by adding the penalties to the judgment, I agree that such is not the intent of this court, but to sustain the law by letting the penalties remain as imposed by the law, and in so doing it is not saying, "to the taxpayer though your property has been overvalued and though you have been wronged by the State, etc." But the

law says to the taxpayer, if you think your property has a cash value of only a certain sum which you name, you may tender the amount of taxes due at the proper time, based on such valuation; you may allege such cash value and tender in your answer in the suit for your delinquent taxes and keep your tender good, and if you succeed in establishing your theory of the value to the satisfaction of the court or jury, the sum you so tender shall be received and you shall not be subject to costs of suit or any penalties, but if you fail in your defense, and the court or jury shall find the value to be a greater sum than that set up in your answer, your defense shall only be effectual as to the proportion of the tax based upon the excess of valuation made by the officers, over and above the value found by the jury or court.

But it is claimed that the defense in such case shall have the further effect of relieving the taxpayer from the penalties for which the statute demands that judgment shall be entered; that the amendment of 1895 was intended by the legislature to repeal the provision imposing penalties where the question of the value of the property is submitted to the courts, and it shall be determined by them that an overvaluation was made, even if in no greater amount than one dollar.

In answer to this contention it is sufficient to say that the legislature of 1895, which amended section 52 of the revenue law, must be presumed to have known the provisions of section 48, which requires certain penalties to be included in all judgments for taxes and the several decisions of this court sustaining such provisions. As they made no change in the law with respect to penalties, they must have desired to let it remain in full force.

I will not add anything further to what is said above by the court, except that since said petitions were filed I have carefully reëxamined the evidence, and reconsidered the briefs and arguments of respective counsel, and am fully satisfied that the evidence is sufficient to support the verdict of the jury, and that the law sustains the judgment for penalties. I see no good reason for further delay in the final determination of this case, and am of opinion that a rehearing should be denied.